# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AQUALLIANCE, a non-profit corporation, and CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>**Plaintiffs,**<br><br>v.<br><br>UNITED STATES BUREAU OF RECLAMATION, a federal agency; RICHARD J. WOODLEY, in his official capacity; LOWELL PIMLEY, in his official capacity; and DAVID MURILLO, in his official capacity,<br><br>**Defendants,**<br><br>SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.*,<br><br>**Defendant-Intervenors.** | Case No. 1:14-CV-000945-LJO-BAM<br><br>**MEMORANDUM DECISION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION (DOC. 7)** |

## I. INTRODUCTION

Plaintiffs AquAlliance and the California Sportfishing Protection Alliance ("Plaintiffs"), both non-profit environmental organizations, bring this lawsuit against the United States Bureau of Reclamation ("Reclamation" or "the Bureau"), as well as various federal officers[1] (collectively, "Federal Defendants"), alleging that the Bureau violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, by approving the "2014 San Luis & Delta-Mendota Water Authority Water Transfer Project" (the "2014 Transfer Project"), which would permit water rights holders or contractors north of the Sacramento-San Joaquin Delta ("Delta") to sell water to members of the San Luis & Delta-

---

[1] The Complaint also names in their official capacities Richard Woodley, Regional Resources Manager of the Bureau's Mid-Pacific Regional Office; Lowell Pimley, Acting Commissioner of the Bureau; and David Murillo, Regional Director of the Bureau's Mid-Pacific Regional Office. Doc. 1, Compl., at ¶¶ 18-20.

1

1  Mendota Water Authority ("SLDMWA"), whose members then would make use of the water in areas

2  that lie south of the Delta. Doc. 1 ("Compl.") at ¶ 57. The Bureau's role would be to review any

3  proposed transfers and facilitate those transfers by conveying the water through the Delta by way of the

4  Jones and Banks Pumping Plants and the Delta-Mendota Canal. *Id.*

5      In April 2014, the Bureau issued an Environmental Assessment ("EA") and approved a Finding

6  of No Significant Impact ("FONSI") for the 2014 Transfer Project under NEPA, 42 U.S.C. § 4321, *et*

7  *seq*. Among other things, the EA and FONSI state that "[s]pecial status fish species," such as the Delta

8  smelt, "are generally not in the Delta during the transfer period (July-September) and effects to these

9  fish species from transferring water during this timeframe were considered in the [National Marine

10  Fisheries Service and U.S. Fish and Wildlife Service Biological Opinions]." Declaration of Kaylee Allen

11  ("Allen Decl."), Doc. 33-1, Ex. 2 ("Final EA") at 3-13; Allen Decl., Ex. 3 ("FONSI") at 8.[2]

12      Plaintiffs allege that the Bureau's approval of the 2014 Transfer Project violated NEPA in two

13  ways.[3] First, Plaintiffs assert that the Final EA and FONSI's conclusion that Delta smelt will not be

14  present in the interior Delta is arbitrary and capricious because it fails to acknowledge that, due to

15  hydrologic conditions and pumping practices, the low-salinity zone ("LSZ"), in which Delta smelt

16  normally reside during the relevant time of the year, will move into the central Delta this year. Doc. 8 at

17  14. Plaintiffs also assert that the Bureau should have prepared a supplemental EA to take into

18  consideration "significant new information" that ostensibly emerged after the issuance of the EA,

19  namely (1) the May 2, 2014 State Water Resources Control Board ("SWRCB") order that relaxed Delta

20  water quality standards; and (2) an analysis performed by Plaintiffs' expert, Tom Cannon, that purports

21  to show that the method used to estimate Delta outflow for management purposes underestimates actual

22  Delta outflow. *Id.* at 11.

23      This case was originally filed in the Sacramento Division of the Eastern District of California,

24  _____

25  [2] The EA and FONSI are attached to the Allen Declaration as Exhibits 2 and 3, respectively. For ease of reference, whenever the Court refers to either document herein, it will use the internal page references provided in the original documents.

26  [3] The Complaint raises several other NEPA claims. But, given that Plaintiffs do not raise those claims in the present motion, they will not be discussed herein.

but was transferred to the undersigned in the Fresno Division pursuant to Local Rule 123 (Related

Cases). Doc. 24. On June 23, 2014, the Court granted the unopposed petition for intervention of

SLDMWA and Westlands Water District, one of SLDMWA's member water districts (collectively,

"Defendant-Intervenors"). Doc. 31.

Before the Court is Plaintiffs' motion for a preliminary injunction that would bar Federal

Defendants from approving or carrying out any water transfers under the 2014 Transfer Project. Doc. 8.

Although Plaintiffs' motion was not filed until June 13, 2014, in light of the allegation that transfers are

scheduled to take place between July 1, 2014 and September 30, 2014, Plaintiffs' motion to shorten time

was granted and a hearing was set for July 10, 2014. *See* Docs. 14 & 22. Federal Defendants and

Defendant Intervenors filed oppositions on June 27, 2014. *See* Docs. 33 & 48. Plaintiffs filed a reply on

July 3, 2014. Doc. 64. On July 7, 2014, the Court requested supplemental briefing on several discrete

legal issues and vacated the July 10 hearing. Doc. 71. The parties responded to the Court's request on

July 9, 2014. Docs. 72-74. Having reviewed the entire record, the Court finds this matter suitable for

decision on the papers pursuant to Local Rule 230(g). As set forth below, the Court finds that Plaintiffs

are not likely to succeed on the merits of the NEPA claims presented and that, therefore, the pending

motion for a preliminary injunction must be DENIED.

## II. <u>STANDARD OF DECISION</u>

In order to secure injunctive relief prior to a full adjudication on the merits, a plaintiff must show

"that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief is "an

extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such

relief." *Id*. at 22.

The Ninth Circuit follows a "sliding scale" approach to preliminary injunctions. *See Alliance for

the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011). Under this approach, a weaker

showing as to the likelihood of success on the merits may be offset by a stronger showing with respect

3

to the balance of the equities. *Id.* at 1131-32. For example, if the moving party is unable to establish a

likelihood of success on the merits, preliminary injunctive relief may still be had if the movant can show

that (1) there are at least "serious questions" going to the merits; (2) the balance of the hardships tips

"sharply" in its favor; and (3) the other factors listed in *Winter* (*i.e.*, irreparable harm and in the public

interest) are satisfied. *Id.* at 1135. "Serious questions" in the context of preliminary injunctive relief are

those that are "substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus

for more deliberative investigation." *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.

1988) (citation and internal quotation marks omitted). They do not need to "promise a certainty of

success, nor even present a probability of success, but must involve a fair chance of success on the

merits." *Id.* (citation and internal quotation marks omitted).

## III. **BACKGROUND**[4]

The Central Valley Project ("CVP") and the State Water Project ("SWP"), "operated

respectively by [Reclamation] and the State of California, are perhaps the two largest and most

important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747

F.3d 581, 592 (9th Cir. 2014) ("*San Luis v. Jewell*"). "These combined projects supply water originating

in northern California to more than 20,000,000 agricultural and domestic consumers in central and

southern California." *Id.* As part of CVP operations, Reclamation releases water stored in CVP

reservoirs in northern California, which then flows down the Sacramento River to the Delta. *Id.* at 594.

Pumping plants in the southern region of the Delta then divert water through the Delta-Mendota Canal

---

[4] Normally, judicial review of agency action is limited to the administrative record ("AR"). 5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party"); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review ... to the agency decision based on the record the agency presents to the reviewing court."). At this preliminary stage, the AR has yet to be certified. So, in describing the background of this case, the Court has relied primarily upon judicially noticeable official agency documents. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (a court may take judicial notice of "matters of public record"); *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 732 (N.D. Cal. 2011) ("It is well established that records, reports, and other documents on file with administrative agencies…are judicially noticeable."). In addition, the Court has referenced a limited number of declarations that provide background information on the highly technical material at issue in this case. *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 573 (9th Cir. 1998) "([T]he court may consider, particularly in highly technical areas, substantive evidence going to the merits of the agency's action where such evidence is necessary as background to determine the sufficiency of the agency's consideration.") (internal citation and quotation omitted).

4

1   and other facilities to various users, including members of SLDMWA.[5]

2   As a condition of Reclamation's operation of CVP facilities in the Delta, Reclamation must

3   comply with SWRCB Decision 1641 ("D-1641"). *See Pac. Coast Fed'n of Fishermen's Assoc'ns v.*

4   *Gutierrez*, 606 F. Supp. 2d 1122, 1133 (E.D. Cal. 2008). D-1641 implements the Bay Delta Water

5   Quality Control Plan through modifications to the CVP, SWP, and other water rights permits. *See*

6   *generally* Allen Decl., Ex. 12 (hereinafter cited only as "D-1641"). D-1641 affects operations of the

7   CVP by regulating salinity levels in the Delta, setting minimum Delta outflow requirements, and

8   regulating export rates of the federal and state water projects. *Id.*

9   Reclamation provides CVP water to users through different types of contracts provided for under

10   Reclamation Law. *See Tehama-Colusa Canal Auth. v. U.S. Dep't of the Interior*, 721 F.3d 1086, 1091

11   (9th Cir. 2013) (summarizing the types and priorities of contracts within the CVP). Because of the

12   extreme drought conditions in California, this water year Reclamation anticipates delivering to

13   Sacramento River Settlement Contractors 75% of their contract supplies, and 0% of contract supplies to

14   south-of-Delta water service contractors, including SLDMWA. Final EA 1-3; Decl. of Richard Woodley

15   ("Woodley Decl."), Doc. 47, at ¶ 6.

16   **A.   Delta Smelt.**

17   The Delta is "the lone habitat for the delta smelt, a threatened species under the Endangered

18   Species Act." *San Luis v. Jewell*, 747 F.3d at 592. It is undisputed that the delta smelt is in "imminent

19   danger of extinction." *Id.* at 595-96. "The 2008 delta smelt population was estimated at 1.5% of [its]

20   1980 level ... and 2009 levels were estimated to be the lowest on record." *Id.* at 596 n. 4.

21   "In 2008, Reclamation requested a biological opinion [("2008 BiOp")] from the U.S. Fish and

22   Wildlife Service [("FWS")], in accord with the [Endangered Species Act ("ESA")], on whether its

23   continued operations would jeopardize the smelt." *Id.* at 592. In its 2008 BiOp, FWS informed

---

25   [5] Reclamation operates the Jones Pumping plant, while the California Department of Water Resources ("DWR") operates the Banks Pumping plant as part of the SWP. *San Luis v. Jewell*, 747 F.3d at 594-95. The federal and state agencies coordinate

26   operations. *See San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 905 F. Supp. 2d 1158, 1164 (E.D. Cal. 2012).

1   Reclamation that continued, long-term CVP operations would jeopardize the continued existence of the

2   delta smelt, but proposed a multi-component "reasonable and prudent alternative" ("RPA") that would

3   avoid jeopardy, which Reclamation has adopted and is implementing. *Id*; Allen Decl., Ex. 4 (2008

4   BiOp) at 294-300.[6]

5         The 2008 BiOp references as relevant to CVP impacts upon delta smelt two related measures of

6   describing salinity in the Delta. *San Luis v. Jewell*, 747 F.3d at 595 (citing 2008 BiOp at 147). The first

7   standard is the LSZ, which "is the transition point between the freshwater of the inland rivers and

8   brackish water flowing eastward from San Francisco Bay and the Pacific Ocean, and includes water

9   ranging in salinity from 0.5 parts per thousand to six parts per thousand." *Id*. (citing 2008 BiOp at 191).

10  The second standard, "X2," represents the point in the Delta where the average daily salinity at the

11  bottom of the water column is two parts per thousand. *Id*. "The LSZ, which encompasses a larger region

12  of the []Delta, is generally centered around X2.... The agencies use X2 as a marker for the LSZ as well

13  as a habitat indicator for fish and as a regulatory standard." *Id.*

14        The 2008 BiOp[7] found that X2 generally tracks the "center point of the LSZ, which is considered

15  suitable spawning habitat for the smelt." *Id*. at 616 (citing 2008 BiOp at 236). In 2010, FWS further

16  explained:

17                    From late spring through fall and early winter, delta smelt are located at
                      the LSZ, which moves depending upon San Francisco Bay-Delta water
18                    outflow [citation]. Reduced Delta water outflow causes the LSZ to move
                      upstream, which seems to concentrate delta smelt in a smaller area along
19                    with other competing planktivorous fishes [citation]. Causes of such
                      reduced outflows include smaller upstream releases from dams, increased
20                    water exports from the State and Federal facilities, and upstream water
                      diversions for flooding rice fields [citation]. Low freshwater outflows in
21                    the fall have been correlated with a reduced abundance index for young
                      delta smelt the following summer [citation].
22

23

[6] The Court will also use the 2008 BiOp's own internal page references.

24  [7] The 2008 BiOp was upheld in its entirety by the Ninth Circuit. *San Luis v. Jewell,* 747 F.3d at 616-34 (petition for rehearing
    en banc pending). While litigation over the 2008 BiOp is ongoing, the BiOp has not been vacated: "[a]bsent lawful
    modifications, the CVP and SWP are required to operate in compliance with the existing RPAs." *In re Consol. Delta Smelt*
25  *Cases*, 2013 WL 1455592, at *9 (E.D. Cal. Apr. 9, 2013). Reclamation is also currently in the process of developing an
    Environmental Impact Statement ("EIS") under NEPA "evaluating the effects of its adoption and implementation of the
26  BiOp's RPAs." *San Luis v. Jewell*, 747 F.3d at 642.

> Delta smelt are also believed to require relatively turbid (not clear) waters to capture prey and avoid predators [citation]. Increased water clarity during the summer and fall has been shown to be negatively correlated with subsequent summer delta smelt abundance indices [citation]. Since 1978, delta smelt have become increasingly rare in summer and fall surveys of the San Joaquin region of the San Francisco Bay-Delta [citation]. The primary reason appears to be the comparatively high water clarity in the region, although high water temperatures are also likely a contributing factor [citation]. The increased water clarity in delta smelt rearing habitat is attributed to the interruption of sediment transport by upstream dams [citation] and the spread of the exotic invasive water plant [citation], which traps suspended sediments [citation].

75 Fed. Reg. 17,667-01, 17,669 (Apr. 7, 2010).

**B.      SWRCB Winter/Spring Temporary Urgency Change Orders.**

This Court recently recognized the historic nature of drought conditions facing Californians in 2014:

> There is no dispute that California is in the midst of an historic, extreme drought. In early May 2014, the California Department of Water Resources ("DWR") projected hydrologic conditions in both the Sacramento Valley and the San Joaquin Valley will be Critically Dry for Water Year 2014. On January 17, 2014, the Governor of California issued a drought emergency proclamation, followed by a second proclamation on April 25, 2014. In light of the current conditions, the [SWRCB] issued several Temporary Urgency Change Orders to the CVP and SWP ("the Projects"), temporarily modifying implementation of [] D–1641, which regulates salinity levels in the Delta by requiring minimum outflow requirements and regulating exports by the Projects. Among other things, the State Water Board's Temporary Urgency Change Orders require the Projects to take measures to maintain upstream storage, including reducing Delta outflow requirements and reducing allowable exports. *Id*. Among other things, relevant federal and state agencies collaborated to develop the [CVP] and [SWP] Drought Operations Forecast ("Drought Operations Plan") in order to meet requirements placed on the Projects by the State Water Board and to meet requirements under the [ESA].

*Friant Water Auth. v. Jewell*, 2014 WL 2197993, ___ F. Supp. 2d ____, at *7 (E.D. Cal. May 27, 2014) (internal citations omitted).

Relevant to this case, the SWRCB's first TUC Order of the year, issued on January 31, 2014, modified the minimum Delta outflow levels to allow for a Net Delta Outflow Index ("NDOI") of no less than 3,000 cubic feet per second ("cfs") in February, and "restricted exports in the Delta at the SWP and

CVP pumping facilities to health and safety needs of no more than 1,500 cfs, with the exception of transfers." *See* Allen Decl., Ex. 20 at 2. Because compliance with the unmodified requirements of D-1641 is assumed in the 2008 BiOp, in conjunction with each TUC petition and in order to ensure compliance with the ESA, Reclamation sought concurrence from FWS that there would be no <u>additional</u> adverse effects on delta smelt or its critical habitat due to the requested changes to D-164 beyond the effects recognized in the 2008 BiOp. *See* Declaration of Ren Lohoefener ("Lohoefener Decl."), Doc. 47-2, at ¶¶ 6-7. The first of these concurrence requests occurred in conjunction with the January TUC petition. In a memorandum dated January 31, 2014, FWS concurred that the January 31 proposed modifications to D-1641, including the transfer exemption to outflow, would not cause any additional adverse effects on delta smelt or its critical habitat beyond those already analyzed in the 2008 BiOp. *Id.* at ¶ 6; Allen Decl., Ex. 25 at 2.

> Although the proposed departure from D-1641 was not anticipated in the Project Description of the BiOp, or the modeling in the biological assessment, the proposed relaxation, based on the provisions provided in the TUC Petition and existing hydrologic and biological conditions for the month of February <u>appear to be within the range of effects previously analyzed in the 2008 BiOp. Therefore, the Service concurs with Reclamation's determination that the proposed modifications will have no additional adverse effects on delta smelt or its critical habitat.</u> As described on p 280 of the BiOp, we will continue to utilize the adaptive process on a weekly basis to proactively meet the biological needs of the delta smelt within the constraints of the critically dry water year conditions.

> In the petition, Reclamation and DWR have proposed to convene a team of managers from Reclamation, DWR, SWRCB, California Department of Fish and Wildlife (DFW), National Marine Fisheries Service (NMFS), and the Service in order to coordinate management of water supplies and protection of natural resources during the course of the declared drought emergency.

> During any period in which Reclamation and DWR are operating the Projects under a temporary change order, there will be close coordination on current and projected operations on a weekly basis through existing meetings (Smelt Working Group, Delta Conditions Team, Water Operations Management Team, etc.). The Service will continue to make weekly determinations under our RPA actions (to include consideration of operations pursuant to a temporary change order) regarding whether changes in operations arc necessary to protect listed fish species....

Allen Decl., Ex. 25 at 2 (emphasis added). FWS concurred with other TUC Orders and other drought-related operational changes for the first part of the year on February 28 and March 14. *See* Allen Decl., Exs. 10 & 21.

**C.      Reclamation's Long-Term Water Transfer Planning & NEPA Compliance.**

In recent years Reclamation has reviewed and approved numerous short-term plans that facilitate the voluntary transfer of water from willing sellers north of the Delta to willing buyers south of the Delta who may be experiencing water shortages. *See* Allen Decl., Ex. 5 at 5, Ex. 2 at 23; Woodley Decl. at ¶ 3. "Such transfers are used more often in dry years when water supplies are limited and there is greater capacity at CVP facilities to convey water across the [Delta] through the export facilities because of the limited availability of CVP water supplies." Woodley Decl. at ¶ 2. On January 17, 2014, and April 25, 2014, the Governor of California issued Emergency Drought Proclamations emphasizing the importance of transfers as a tool to be used during drought conditions. *See* Allen Decl., Ex. 11. Reclamation is currently preparing an Environmental Impact Statement ("EIS") under NEPA that would cover potential future water transfers for a period of up to 10 years, and anticipates releasing a draft to the public in September 2014. Woodley Decl. at ¶ 12.

**D.      2014 Water Transfer Project & Draft EA.**

SLDMWA members are among the CVP contractors located south of the Delta who will experience severe shortages of water this year and have been seeking potential transfers of water. *See* Final EA at 1-2. Accordingly, the 2014 Transfer Project proposes "the transfer of water in contract year 2014 to Participating Members of the SLDMWA." *Id.* at 2-1. Reclamation's role in those transfers will be to approve and facilitate the transfer through use of federal facilities. *See id.* at 1-2.

In order to evaluate the potential environmental effects of Reclamation's "proposed action" approving and facilitating of the transfer of up to 175,226 AF of water in 2014, and to determine whether the proposed action would result in significant environmental impacts, Reclamation prepared and released a Draft Environmental Assessment ("Draft EA") on March 13, 2014 for public comment. *See* Allen Decl., Ex. 1. The Draft EA states:

1

> Water transfers would slightly increase river flows downstream of the point of diversion relative to the No Action Alternative during the transfer period. Reclamation is consulting frequently with USFWS and NMFS on CVP and SWP operations relative to the [BiOps] and special status fish species in the Delta. Special status fish species would not be affected by the Proposed Action beyond those impacts considered by the BOs and current consultations with NMFS and USFWS.

2

3

4

5   *Id*. at 15. The Draft EA also mentions the fact that on January 31, 2004 the SWRCB approved a

6   Temporary Urgency Change ("TUC") Order that relaxed certain Delta regulatory requirements governed

7   by D-1641 and states that Reclamation will operate to the TUC Order as it may be amended and as

8   necessary to address critically dry conditions. *Id*.

9   **E.        Plaintiffs' Comments on the Draft EA.**

10          On April 2, 2014, AquAlliance, through counsel Thomas Lippe and member Barbara Vlamis,

11   submitted comments on the EA. Mr. Lippe's comments related to air quality impacts. Allen Decl., Ex. 2

12   at 115-21. Ms. Vlamis's comments referenced an analysis by Thomas Cannon entitled "Summer 2013:

13   The demise of Delta smelt under D-1641 Delta Water Quality Standards," and stated:

14

> On page 3-13, the EA/IS continues its discussion to support the finding of Less Than Significant Impact for, "[a]ny species identified as a candidate, sensitive, or special status species in local or regional plans, policies, or regulations, or by the California Department of Fish and wildlife or U.S. Fish and Wildlife Service," with NMFS excluded as noted above (p.3-11). The EA/IS concludes that, "The incremental effects of transfers on special status fish species in the Delta from water transfers would be less than significant." What data and analysis support this conclusion and where is the material found? Analysis conducted by Thomas Cannon contradicts the Less Than Significant Impact finding with disturbing results from the summer of 2013. His research reveals that summer water transfers are devastating, especially in dry years when the low salinity zone is in the western Delta and smelt are stuck within the Delta and threatened by warm water, which has been made available for transfer by either fallowing or groundwater substitution, and predators[.]

15

16

17

18

19

20

21

22   *Id*. at 134 (emphasis added) (footnote omitted).

23          Reclamation responded to both of those submissions in its Final EA. *See id.* at 165-67, 175.

24   Specifically, in response to Ms. Vlamis's comment, the EA cited to FWS's 2008 BiOp for the

25   proposition that delta smelt are not near the pumps in the summer months and would not be affected by

26   transfers, stating:

Water transfers are a small portion of total Project deliveries during the summer months. Resource agencies, including USFWS and NMFS, evaluated the effects of water transfers in the Biological Opinions and placed limitations on transfers during the July – September period to reduce potential effects. The agencies found that transfers would not affect special status fish species given these constraints. The cited paper by Thomas Cannon does not specifically mention water transfers at all throughout the document. USFWS evaluated impacts to Delta smelt in the Biological Opinions and concluded that smelt are not near the pumps in the summer months and would not be affected by water transfers.

*Id*. at 175.

## F.   Reclamation's Consultation with FWS Regarding Transfers.

In accordance with its obligations under Section 7 of the ESA, 16 U.S.C. § 1536, on March 26, 2014, Reclamation requested consultation with FWS on the potential effects of 2014 transfers on listed species and their designated critical habitats. *See* Allen Decl., Ex. 6 at 1. On April 17, 2014, Reclamation provided an amended Biological Assessment ("BA")[8] that included the latest information on drought planning and water allocations. *See* Allen Decl., Ex. 5 at 11 (discussing the operational parameters, including the January 31 TUC Order as may be amended).

The starting point for this consultation was the 2008 BiOp, which discussed the potential effects of transferring up to 600,000 AF of water in "critical" and "dry" years, and anticipated that transfers would be limited to the months of July through September, when "delta smelt are rarely present in the Delta[.]" 2008 BiOp at 229. Among the five RPA components included in the 2008 BiOp, Components 1 and 2 limit reverse flows in Old and Middle Rivers ("OMR") caused by the Jones and Banks pumping plants in order to "to reduce entrainment of pre-spawning adult delta smelt during December to March by controlling OMR flows during vulnerable periods" and "improve flow conditions in the Central and

---

[8] Section 7(c) of the ESA mandates the preparation of a BA when a listed species may be present in a project area. 16 U.S.C. § 1536(c). A BA is a condition precedent for the eventual issuance of a biological opinion, if a biological opinion is needed. *See* 50 C.F.R. § 402.12(k)(2) (2006) (stating, inter alia, that a biological assessment may be used in "(I) determining whether to request the Federal agency to initiate formal consultation or a conference, (ii) formulating a biological opinion, or (iii) formulating a preliminary biological opinion"). If, as a result of preparing a BA, the action agency concludes that the proposed action is likely to adversely affect listed species or appreciably modify critical habitat, then formal consultation under the ESA is required. *See* 50 C.F.R. § 402.14. If listed species are present and likely to be affected by the described action, the consulting agency must prepare a formal biological opinion, which details how the action will affect the listed species and whether the proposed action is likely to "jeopardize" the species or adversely destroy or modify critical habitat. 50 C.F.R. § 402.14(h).

1  South Delta so that larval and juvenile delta smelt can successfully rear in the Central Delta and move

2  downstream[,]" respectively. *Id*. at 280. The RPA does not limit reverse flows between July and

3  September, *id*. at 280-85, in part because smelt are not thought to be able to transit that part of the delta

4  in the summer because the temperatures are too high. *See id*. at 364 ("As temperatures rise, trawl data

5  continue to show no fish in the Central and South Delta, and salvage does not occur, OMR flows will be

6  allowed to become as negative as -5,000 cfs. When temperature rises and turbidity drops to levels likely

7  to be inimical to delta smelt (> 25°C, turbidity <12 NTU), no further restrictions are needed as long as

8  salvage remains at or close to zero."); *see also id*. at 151, 282, 358.

9       In a memorandum dated April 21, 2014, FWS determined that the effects of the 2014 Transfer

10  Project summarized in the amended BA were covered by the consultation on the 2008 BiOp and that no

11  additional adverse effects to delta smelt or designated critical habitat, or increased incidental take as a

12  result of the 2014 transfers were anticipated to occur. *See* Allen Decl., Ex. 6 at 2.

13  **G.**    **Final EA on 2014 Transfer Project.**

14       Following receipt of the April 21, 2014 concurrence memorandum from FWS, Reclamation

15  issued a Final EA and FONSI on April 22, 2014, determining, among other things, that the incremental

16  effects of the subject water transfers on special status fish species in the Delta, including delta smelt,

17  would be less than significant. FONSI at 9. The Final EA states:

18          The Proposed Action would result in increased conveyance [of water] through the
   Delta during the transfer period (July through September, unless it shifts based on
19          feedback from NMFS and USFWS). Special status fish species are generally not
   in the Delta during the transfer period (July-September) and effects to these fish
20          species from transferring water during this timeframe were considered in the
   [National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service
   (FWS) Biological Opinions]. Transfers would slightly increase inflow into the
21          Delta, but would not change outflow conditions as compared to the No Action
   Alternative. The incremental effects of transfers on special status fish species in
22          the Delta from water transfers would be less than significant.

23  Final EA at 3-13 (emphasis added).

24       The EA/FONSI did not directly approve any water transfers. After issuing the FONSI,

25  Reclamation began to receive written transfer requests and written proposals from the willing sellers for

26  approval, which it is currently reviewing. *See* Woodley Decl. at ¶¶ 8-9. As of July 3, 2014, Reclamation

anticipated approving four such transfers by as early as July 7, 2014. Second Declaration of Ronald

Milligan, Doc. 67-1, at ¶ 2. Upon approval, Reclamation will begin adjusting CVP operations to make

deliveries pursuant to the transfer agreements. *Id*. at ¶ 4. Shortly after commencement of transfer

operations, Reclamation anticipates transfers will account for approximately 100 cfs of total CVP

exports. *Id*. at ¶ 5. As more transfers are approved, transfers are anticipated to account for up to 300 cfs

of exports at Jones Pumping Plant later in July through September. *Id*.

**H.       The Drought Operations Plan, May 2, 2014 SWRCB TUC Order, and FWS Review.**

On April 8, 2014, state and federal agencies issued a Drought Operations Plan ("DOP") and

Operational Forecast. *See* Declaration of Ronald Milligan, Doc. 47-1, at ¶ 13; Allen Decl., Ex. 7 at 3.

The DOP outlined proposed operations for April and May, and two possible operational scenarios for

June through November, varying the deployment of physical barriers in the Delta. *See* Lohoefener Decl.

at ¶ 7; Allen Decl., Ex. 7 at 81. The DOP mentions that transfers may take place, but notes that increased

pumping rates that may be necessitated by the transfers were not included in the description of the DOP.

Allen Decl., Ex. 7 at 15. Reclamation transmitted this DOP and Operational Forecast, along with a

biological assessment of the effects of implementing the DOP, to FWS on April 8, 2014, again seeking

concurrence that drought response actions proposed by Reclamation and DWR in the DOP would result

in no additional adverse effects to delta smelt or its critical habitat for the remainder of Water Year 2014

beyond those analyzed in the 2008 BiOp. *Id*. at 1. By memo dated April 8, 2014, FWS concurred with

Reclamation's determination that the proposed modifications for April and May would have no

additional adverse effects on delta smelt or its critical habitat, but requested additional information

before making a determination for June onward. *See* Lohoefener Decl. at ¶ 7; Allen Decl., Ex. 8 at 8.

On April 29, Reclamation and DWR applied to the SWRCB for a further modification of the

TUC Order. *See* Allen Decl., Ex. 20 at 1. Reclamation proposed to extend the modified 3,000 cfs NDOI

requirement that had already been applied to February, March, and April into May and July. *Id*. at 2-3.

On May 1, 2014, Reclamation transmitted a memorandum and additional information to FWS

regarding the DOP. *See* Lohoefener Decl. ¶ 8; Allen Decl., Ex. 9. This information clarified that

13

operations in June through November would be implemented as described in the DOP's scenario that did not include any physical delta barriers. Allen Decl., Ex. 9 at 1, 3. It also assumed approval by the SWRCB of a TUC Order that would extend the modified 3,000 cfs NDOI requirement into May and July. *Id*. at 4. Risks to smelt from the modifications were discussed, including potential habitat constraints due to the upstream tidal excursion of higher salinity water, *id*. at 6-7, and the potential for additional entrainment at the pumps, *id*. at 10. The memorandum also contained real-time data from April 2014 showing "that the majority of the adult population" were then located in the Sacramento Deep Water Shipping Cannel, "outside of the influence of the export facilities." *Id*. at 11, 13-14. The report acknowledged that a limited distribution of smelt larvae were being entrained at the pumps, but explained these individuals would be lost to the population regardless of pumping because of the high temperature "off-ramp" to RPA Action 3 at the end of June, *id*. at 12, 15, and in any event, "Delta Smelt[, including juveniles,] do not use the South Delta as habitat during the [summer and fall] months." *Id*. at 15.

In a May 1, 2014 response memorandum, FWS concurred with Reclamation that the proposed modifications for June through November, including a minimum monthly NDOI of 3,000 cfs for the month of July, and a change in the Salinity Standard compliance location to Three Mile Slough, would have no additional adverse effects on delta smelt or its critical habitat beyond those previously analyzed in the 2008 BiOp. *See* Lohoefener Decl. at ¶ 8; Allen Decl., Ex. 10 at 3-4. On May 2, 2014, the SWRCB issued its amended TUC Order adopting the changes Reclamation and DWR had proposed. Allen Decl., Ex. 20 at 1.

**I.    Plaintiffs' Request for Supplemental NEPA Review.**

On May 30, 2014, Plaintiffs, through counsel, sent Reclamation a letter requesting supplemental NEPA review of the 2014 Transfer Project. Doc. 10, Ex. 1. The letter asserted that the SWRCB May 2, 2014 TUC Order constituted "changed circumstances" requiring a supplemental EA. *Id*. at 1. In addition, the letter pointed to a "Review of Summer 2014 Water Transfers Federal Environmental Assessment, Report by Tom Cannon, May 29, 2014," in support of the assertion that the SWRCB's May

2, 2014 TUC Order would cause the LSZ to shift further to the east, thereby exposing delta smelt to adverse conditions and higher mortality. *Id*. at 6-7. The letter asserted that Tom Cannon's May 29, 2014 Report, constituted "new information" not previously analyzed in the April 22, 2014, FONSI. *Id*. at 1.

Reclamation solicited two expert biologists in the field to review Mr. Cannon's May 29 Report. Allen Decl., Ex. 26 at 1. Those two experts concurred that the concerns outlined in Mr. Cannon's May 29 Report were without merit. Ms. Frances Brewster opined, in pertinent part:

> [The] arguments make no sense to me.
>
> 1. They claim there will be higher mortality due to higher temperatures at 3-mile slough than at Emmation. That claim is not supported by the data. I compared temps at Emmation with those at Rio Vista for 7/1/2013 through 10/2/2013 (the transfer window). Rio vista is considerably further upstream than 3-mile slough, but the 3-mile slough station doesn't have a temp sensor. The average difference in temperature is 0.5 degrees F... That difference in temperature is insignificant....
>
> 2. They claim there will be increased entrainment of young-of-the-year due to higher reverse flows. The BiOps have no OMR requirements during the transfer window and in a typical year OMRs can be upwards of -8000 cfs.... There is no BiOp OMR requirements [sic] during the transfer window timeframe because entrainment risk is so low based on historic data.

*Id*. at 1. Dr. Erwin Van Nieuwenhuyse agreed:

> I read Tom Cannon's report and Frances Brewster's comments and agree with Frances' assessment. I don't think that Tom's concerns about increased entrainment are warranted given how low OMR flows are expected to be and his concerns about increased water temperature and reduced turbidity and foodweb productivity are also off the mark. As frances points out, the area of the [LSZ] will not change appreciably and the temperature difference between Emmation and Rio Vista is negligible. Under these low flow conditions, turbidity in the LSZ is mostly a function of wind induced sediment resuspension rather than flow. Similarly, I would not expect the proposed water transfers to have any discernible effect on the LSZ foodweb. Most of the smelt population now resides in the Sacramento Deepwater ship channel upstream of Cache Slough. The ship channel offers relatively high food supplies for smelt and is thermally stratified during July-Oct. Our data indicate that temperature in the lower half of the water column (below six meters) remains below 23 C during summer-fall. The ship channel is thus a temperature refuge for over-summering fish. By contrast, unless management actions are taken to stimulate a fall phytoplankton bloom in the lower Sacramento River, the LSZ during the water transfer period is likely to remain relatively food-poor with water temperatures at or near the 25 C threshold. I do not think

the proposed transfer would increase the likelihood of delta smelt
extinction.

*Id*. at 2. Based on these comments, Reclamation determined that the impacts of the information provided were already covered in the existing EA and that no changes were warranted. *Id*. at 3.

On June 10, 2014, Plaintiffs' counsel again wrote Reclamation pointing to a second report by Mr. Cannon purporting to show that NDOI "grossly overestimates actual Delta outflow." Doc. 10, Ex. 2 at 3. Plaintiffs again asserted this report constituted new information requiring supplemental NEPA analysis. *Id*. Plaintiffs filed this lawsuit the next day, on June 11, 2014. Doc. 1.

## IV. DISCUSSION

**A.    Likelihood of Success on the Merits.**

    **1.    Applicable Legal Standards.**

        **a.    NEPA.**

"NEPA is our 'basic national charter for protection of the environment.'" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1185 (9th Cir. 2008) (quoting 40 C.F.R. § 1500.1). "Although NEPA does not impose any substantive requirements on federal agencies, it does impose procedural requirements." *N. Idaho Cmty. Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). "Through these procedural requirements, NEPA seeks to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger public audience." *Id*. (internal citations and quotations omitted).

NEPA does not explicitly provide for a private right of action. Therefore, claims alleging that a federal agency acted contrary to NEPA must be brought under and are governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. *See Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 573 (9th Cir. 1998).

//

//

16

**b.      APA Deference Applied to Analyzing Likelihood of Success on the Merits in the Context of Injunctive Relief.**

In assessing the likelihood of success on the merits in a case such as this, where all claims are governed by the APA, 5 U.S.C. § 701, *et seq.*, the court applies the deferential arbitrary and capricious standard of review. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008). Under the APA, reviewing courts may reverse agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts should defer to the agency on matters within the agency's expertise unless the agency completely failed to address a factor that was essential to making an informed decision. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005). A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). As the Ninth Circuit continued in *River Runners*:

> In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made ... and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action ... need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

*Id.* at 1070.

Reviewing courts must be at their "most deferential" when an agency makes predictions, "within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87, 103 (1983). In particular, an agency's "scientific methodology is owed substantial deference." *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004). The deferential nature of a court's inquiry into the merits is not altered at the preliminary injunction stage. *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005) (finding that, in granting a preliminary injunction, "the district court

committed legal error by failing to respect the agency's judgment and expertise").[9]

"The deference accorded an agency's scientific or technical expertise is not unlimited." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001). Deference is not owed if "the agency has completely failed to address some factor consideration of which was essential to making an informed decision," *id.*, and courts are not required to defer to an agency conclusion that runs counter to that of other agencies or other individuals with specialized expertise in a particular technical area. *See, e.g., Am. Tunaboat Ass'n v. Baldrige*, 738 F.2d 1013, 1016-17 (9th Cir. 1984) (agency decision under the Marine Mammal Protection Act was not supported by substantial evidence because agency ignored data that was product of "many years' effort by trained research personnel").

### 2.    Plaintiffs' Challenges to the Content of the EA.

Plaintiffs allege that Reclamation's Final EA and FONSI are arbitrary and capricious because both documents "incorrectly assume the fish are not present in the Delta in July and August" and that this assumption contradicts the 2008 BiOp's explanation of the LSZ and its connection to delta smelt distribution. Doc. 8 at 14-15.

### a.    Federal Defendants' Threshold Objections.

### (1)    Waiver.

Federal Defendants[10] argue that Plaintiffs have waived this challenge to the EA/FONSI by failing to raise it during the administrative process. Doc. 33 at 13-14. The applicable standard is well established. The APA requires that plaintiffs exhaust administrative remedies before bringing suit in federal court. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006). In the NEPA context, this means that a plaintiff "must structure [its] participation so that it ... alerts the agency [of its]

---

[9] Although a court's analysis of likelihood of success in the context of an injunctive relief request is governed by the deferential APA's arbitrary and capricious standard, *see Ranchers Cattlemen*, 415 F.3d at 1093, a court does not always owe deference to federal agencies' positions concerning irreparable harm, balance of hardships, or public interest. In *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011), decided in the context of a motion for a post-judgment permanent injunction, the Ninth Circuit held that a district court "abused its discretion by deferring to agency views concerning the equitable prerequisites of an injunction." The Ninth Circuit reasoned that "[e]cology is not a field within the unique expertise of the federal government," and remanded for analysis "without deference" to the agency's experts "simply because of their relationships with the agency." *Id.* If government experts "were always entitled to deference concerning the equities of an injunction, substantive relief against federal government policies would be nearly unattainable." *Id.*

[10] Defendant Intervenors have joined in all the merits arguments of Federal Defendants. *See* Doc. 48 at 4.

1 positions and contentions, in order to allow the agency to give the issue[s] meaningful consideration."

2 *Id.* (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004)). The purpose of the

3 exhaustion requirement is to avoid premature claims and to ensure the agency is given "a chance to

4 bring its expertise to bear to resolve a claim." *Id.* "[A] claimant need not raise an issue using precise

5 legal formulations, as long as enough clarity is provided that the decision maker understands the issue

6 raised." *Lands Council v. McNair,* 629 F.3d 1070, 1076 (9th Cir. 2010) (internal quotation and citation

7 omitted). Accordingly, "alerting the agency in general terms will be enough if the agency has been given

8 a chance to bring its expertise to bear to resolve the claim." *Id.* If a plaintiff fails to meet exhaustion

9 requirements, its claim is waived. *See Pub. Citizen*, 541 U.S. at 764–65. Comments submitted by third

10 parties may form the basis of a NEPA lawsuit, so long as the comments brought sufficient attention to

11 the issue. *Pac. Coast Fed'n of Fishermen's Associations v. U.S. Dep't of Interior*, 2014 WL 496906,

12 *10, __ F. Supp. 2d __ (E.D. Cal. Feb. 6, 2014).

13        AquAlliance, through counsel Thomas Lippe and Executive Director Barbara Vlamis, submitted

14 comments on the EA. Federal Defendants correctly point out that Mr. Lippe's comments are exclusively

15 focused on air quality impacts of the proposed transfers. *See* Allen Decl., Ex. 2 at 115-21, Doc. 133.

16 However, as Federal Defendants acknowledge, Ms. Vlamis's comments referenced Thomas Cannon's

17 2013 analysis of the impacts of summer water transfers on delta smelt, stating:

18                Analysis conducted by Thomas Cannon contradicts the Less Than
               Significant Impact finding with disturbing results from the summer of
19                2013. His research reveals that summer water transfers are devastating,
               especially in dry years when the low salinity zone is in the western Delta
20                and smelt are stuck within the Delta and threatened by warm water, which
               has been made available for transfer by either fallowing or groundwater
21                substitution, and predators[.]

22 Allen Decl., Ex 2 at 134 (emphasis added) (footnote omitted).

23        Federal Defendants do not in fact argue that this comment failed to give the agency enough

24 notice of the challenge now before the Court. In fact, Federal Defendants admit they responded to the

25 comment. *See* Doc. 33 at 5 (citing Allen Decl, Ex. 2 at 1165-67). What Federal Defendants do assert is

26 that no commentator ever challenged the 2008 BiOp's premise that delta smelt are generally not in the

19

Delta during the proposed transfer period. *Id*. at 5. This is technically true. Plaintiffs no not actually

contradict the assertion that delta smelt are "generally" not in the Delta during the transfer period. But,

Ms. Vlamis's letter clearly <u>does</u> assert that in dry years, such as this one, delta smelt are "stuck within

the Delta and threatened by warm water." Allen Decl., Ex 2 at 134. The issue may not have been raised

using "precise legal formulations" but it has not been waived. Plaintiffs claim will rise or fall on the

merits in the form Plaintiffs give it.

### (2)   Federal Defendants' Argument that Plaintiffs' "Challenge to the BiOp Must Be Brought Pursuant to the ESA."

Federal Defendants second threshold objection is confusing but warrants some discussion. They

assert:

> Plaintiffs' argument that the LSZ analysis in the 2008 BiOp and the smelt distribution assumptions in the EA/FONSI are in tension fails to acknowledge that [FWS] considered potential water transfers between July through September in the 2008 BiOp and concluded such transfers would not adversely affect delta smelt because "Delta smelt are rarely present in the Delta in these months."

Doc. 33 at 14. Reclamation relies upon the 2008 BiOp in its EA. Federal Defendants argue that if

Plaintiffs wants to challenge the 2008 BiOp's characterization of delta smelt distribution during summer

months, they must do so through a direct challenge to the 2008 BiOp under the ESA. *Id*. No ESA

challenge has been presented in this lawsuit and FWS is not a party to this suit. Moreover, the substance

of the 2008 BiOp has been upheld by the Ninth Circuit. *See San Luis v. Jewell*, 747 F.3d at 616-34.

It is unclear whether Federal Defendants imply by their argument that Plaintiffs' NEPA

challenge is somehow faulty because Plaintiffs have not brought a simultaneous challenge to the BiOp.

Federal Defendants do not cite and the Court cannot locate any authority for the proposition that a party

cannot <u>bring</u> a NEPA challenge to a NEPA document simply because that NEPA document relies upon

reasoning in an ESA document without simultaneously challenging that ESA document. As such, the

lack of a parallel ESA challenge is not a procedural bar to Plaintiffs' NEPA suit. The extent to which

Reclamation may rely upon the 2008 ESA BiOp to support its NEPA document is discussed below.

**b.      The Merits of Plaintiffs' EA Challenge.**[11]

NEPA requires federal agencies to analyze the potential environmental impacts of any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). When an agency takes major federal action, the agency must prepare an EIS "where there are substantial questions about whether a project may cause significant degradation of the human environment." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

An agency may choose to prepare an EA to determine whether an EIS is needed. 40 C.F.R. §§ 1501.4, 1508.9(b). An EA is meant to be a "concise public document ... that serves to," among other things "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a)(1); *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988). Based on the EA, the agency "may conclude that the action will not significantly affect the environment and issue a [FONSI]." *Bob Marshall*, 852 F.2d at 1225 (citing 40 C.F.R. § 1508.13). An EA "need not conform to all the requirements of an EIS, [but] it must be sufficient to establish the reasonableness of the decision not to prepare an EIS." *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008) (quotations and alteration omitted).

> The purpose of an EA is not to compile an exhaustive examination of each and every tangential event that potentially could impact the [] environment. Such a task is impossible, and never-ending. The purpose of the EA is simply to create a workable public document that briefly provides evidence and analysis for an agency's finding regarding an environmental impact.

*Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012). The EA must only "provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012)

---

[11] For the purpose of analyzing this merits challenge to the EA, the Court has considered documents that appear likely to become part of the AR, namely, official NEPA and ESA documents produced before the EA issued, including comments (with attachments) submitted by Plaintiffs to Federal Defendants. The Court has, in an abundance of caution, not considered any of the expert declarations submitted in this case, having been provided with no briefing on the question of whether any such declarations would be admissible as to this merits issue.

(internal citation and quotation omitted). A court must "defer to agency decisions so long as those conclusions are supported by studies [] the agency deems reliable." *Id*. (internal citation and quotation omitted).

Here, Plaintiffs take issue with the EA's assumption that "[s]pecial status fish species," such as the delta smelt, "are generally not in the Delta during the transfer period." There is nothing inaccurate, *per se*, about this statement. The 2008 BiOp concurs that delta smelt are "rarely" in the Delta during the transfer period. 2008 BiOp at 229. What Plaintiffs really protest is the fact that the EA assumes that this general statement applies in this uniquely dry year, during which Plaintiffs maintain delta smelt in fact will be present in the Delta. Plaintiffs maintain that the Bureau's EA is insufficient because it fails to acknowledge this fact and therefore fails to acknowledge potentially significant impacts that will result from the smelt being present in the Delta. Specifically, Plaintiffs' comments on the Draft EA suggest that in dry years the smelt will be "stuck within the Delta and threatened by warm water."[12]

The EA first addresses impacts on "special status species" like the delta smelt in its explanation of conditions that will persist in the absence of the 2014 Transfer Project under the "No Action Alternative":

> Continued dry hydrologic conditions could affect special status fish species by reducing inflow to the Delta that could affect the ability of Reclamation and DWR to meet the operational requirements of the NMFS and USFWS BOs and D1641. CVP and SWP operations in the Delta will be managed adaptively to meet environmental and water quality standards that are put in place throughout the water year. Reclamation is consulting frequently with NMFS and USFWS on CVP and SWP operations relative to the BOs and special status fish species in the Delta. Reclamation and DWR submitted, and the SWRCB granted a temporary urgency change (TUC) petition on January 31, 2014. The SWRCB relaxed some salinity and outflow criteria in the Delta in response to extremely low storage levels, and amendments to the TUC may be necessary as conditions warrant.

Final EA at 3-12. The Final EA then addresses, generally, the impact of the proposed transfers on

---

[12] Relative to the EA's assertion that delta smelt are generally not present in the Delta during the transfer period, Plaintiffs' comment letter only suggested that this would expose delta smelt to dangerously high temperatures. Therefore, this is the only assertion of harm the Court will evaluate in this section. Other harms ostensibly related to "being stuck in within the Delta" mentioned in the papers, such as harm to delta smelt food sources, have not been exhausted, so will not be discussed.

special status species:

> The Proposed Action would result in increased conveyance [of water] through the Delta during the transfer period (July through September, unless it shifts based on feedback from NMFS and USFWS). Special status fish species are generally not in the Delta during the transfer period (July-September) and effects to these fish species from transferring water during this timeframe were considered in the [National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service (FWS) Biological Opinions]. Transfers would slightly increase inflow into the Delta, but would not change outflow conditions as compared to the No Action Alternative. The incremental effects of transfers on special status fish species in the Delta from water transfers would be less than significant.

*Id*. at 3-13. The Final EA also addresses Plaintiffs' specific comment as follows:

> Water transfers are a small portion of total Project deliveries during the summer months. Resource agencies, including USFWS and NMFS, evaluated the effects of water transfers in the Biological Opinions and placed limitations on transfers during the July – September period to reduce potential effects. The agencies found that transfers would not affect special status fish species given these constraints. The cited paper by Thomas Cannon does not specifically mention water transfers at all throughout the document. USFWS evaluated impacts to Delta smelt in the Biological Opinions and concluded that smelt are not near the pumps in the summer months and would not be affected by water transfers.

Allen Decl, Ex. 2 at 175.

Although the reasoning in the EA itself is brief and summary in nature, it is permissible for Reclamation to incorporate by reference the reasoning contained the 2008 BiOp, an ESA document. *See Nw. Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.*, 647 F. Supp. 2d 1221, 1247 (D. Or. 2009). As mentioned above, the 2008 BiOp discussed the potential effects of transferring up to 600,000 AF of water in "critical" and "dry" years, and anticipated that transfers would be limited to the months of July through September, when "delta smelt are rarely present in the Delta[.]" 2008 BiOp at 229. The 2008 BiOp also indicates "the location of the delta smelt population follows changes in the location of the LSZ." *Id*. at 147. Plaintiffs assert that these two assertions are inherently inconsistent because: (1) the LSZ is drawn into the Delta during low flow periods; and (2) if the delta smelt follow the LSZ, they too must be drawn into the Delta during low flow periods, where they will be exposed to, among other things, lethal temperature conditions.

1    As to the first of these assertions, the report by Tom Cannon referenced in Plaintiffs' comments

2    on the Draft EA opines that in low flow conditions observed in 2013, the LSZ was drawn into the Delta

3    in mid to late July. First Declaration of Tom Cannon ("First Cannon Decl."), Doc. 9, Ex. 2, at 17.

4    Federal Defendants do not appear to dispute this assertion. *See* Doc. 33 at 16, 20 (citing Allen Decl., Ex.

5    9 for the proposition that D-164 may shift X2 eastward, which could shift the center of the LSZ).[13]

6    The second of Plaintiffs' assertions is disputed. Cannon insists that the smelt will move with the

7    LSZ into the Delta. For example, although his report acknowledges that, at least in 2013, no smelt were

8    salvaged in July (*i.e.*, no smelt were collected at the pumping plants' fish screens), Cannon opines that

9    this is because "[n]o smelt were able to survive passage to the South Delta export salvage facilities

10   because of lethal water temperatures in the Central and South Delta." First Cannon Decl, Ex. 2 at 17-18.

11   In contrast, the 2008 BiOp concludes that the delta smelt population simply does not follow the LSZ into

12   the Central and South Delta during the transfer period. Among the five RPA components included in the

13   2008 BiOp, Components 1 and 2 limit OMR reverse in order to "to reduce entrainment of pre-spawning

14   adult delta smelt during December to March by controlling OMR flows during vulnerable periods" and

15   "improve flow conditions in the Central and South Delta so that larval and juvenile delta smelt can

16   successfully rear in the Central Delta and move downstream[,]" respectively. 2008 BiOp at 282. The

17   RPA does not limit reverse flows between July and September, *id.* 280-85, in part because smelt are not

18   thought to be able to transit that part of the Delta in the summer because the temperatures are too high.

19   2008 BiOp at 151 ("warmer temperatures >25**°**C restrict distribution more than colder water

20   temperatures"), 358 (setting temperature "offramp" for spring OMR restrictions), 364 ("As temperatures

21   rise, trawl data continue to show no fish in the Central and South Delta, and salvage does not occur,

22   OMR flows will be allowed to become as negative as -5,000 cfs. When temperature rises and turbidity

23   drops to levels likely to be inimical to delta smelt (> 25**°**C, turbidity <12 NTU), no further restrictions

24   are needed as long as salvage remains at or close to zero."). FWS reaffirmed this reasoning in its April

25

---

26   [13] The Court notes that the Parties variously describe regions within the Delta, including the "western Delta," "central Delta," and "southern Delta," without carefully defining those regional boundaries.

21, 2014 concurrence memorandum, which found the effects of the 2014 Transfer Project were encompassed by the analysis in the 2008 BiOp and concluded that no additional adverse effects to delta smelt or designated critical habitat were anticipated to occur. *See* Allen Decl., Ex. 6 at 2.[14]

This amounts to a dispute between Plaintiffs' chosen expert, Tom Cannon, and FWS, the agency with relevant expertise in the impacts of water project operation on the delta smelt.[15] In such a circumstance, the court must defer to the expert agency's determinations. For example, in *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992), the National Marine Fisheries Service ("NMFS") approved a plan to regulate fishing in an area populated by the Stellar sea lion. While Greenpeace's evidence demonstrated that there was uncertainty as to how the fishing would affect the sea lion and that NMFS did not prove harm to the sea lion was impossible, the Ninth Circuit refused to set aside NMFS's decision because to do so would require the Court to decide that the views of Greenpeace's experts have more merit than those of NMFS. *Id.* at 1333. In *Greenpeace*, the Ninth Circuit relied upon *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976 (9th Cir. 1985), which upheld a decision by FWS not to prepare an EIS in connection with the issuance of a permit allowing some development in an area occupied by and endangered butterfly species. In response to plaintiff's argument that FWS based its decision on faulty data, the Ninth Circuit held that "NEPA does not require that we decide whether an [environmental assessment] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology." *Id.* at 986.

*Greenpeace* and a long line of cases, including *San Luis v. Jewell*, 747 F.3d 581, emphasize that

---

[14] Federal Defendants and Defendant Intervenors' experts opine that a large portion of the delta smelt population is located north of the Delta, in the Sacramento Deep Water Shipping Channel, which may act as a refuge for delta smelt from some of the harsher conditions within the Delta. Federal Defendants' and Defendant Intervenors' experts rely, at least in part, on this population to argue that the project will not harm delta smelt. Because the Final EA, the 2008 BiOp, nor any document presented to the Court as having been before the agency at the time the Final EA issued mentions this theory, the Court has not considered it in its analysis of the sufficiency of the EA. Nonetheless, the 2008 BiOp clearly concludes that the smelt do not follow the LSZ into the interior Delta during the summer because temperatures are too high there. The 2008 BiOp's conclusions have been upheld by the Ninth Circuit and the Court does consider the 2008 BiOp's conclusions here.

[15] Plaintiffs argue that in this case there are no agency expert opinions in the record to which the court could defer, pointing to Federal Defendants' extra-record expert declarations. As discussed above, the Court has not considered these declarations and is deferring only to FWS's analyses of the impacts of project operations and the 2014 Transfer Project on delta smelt. Reclamation is entitled to rely on FWS's expertise.

1    a court should defer to agency experts. A court "may not substitute its judgment for that of the agency

2    concerning the wisdom or prudence of [the agency's] action." *River Runners*, 593 F.3d at 1070.

> 3    In conducting an APA review, the court must determine whether the
> agency's decision is "founded on a rational connection between the facts
> 4    found and the choices made ... and whether [the agency] has committed a
> clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish &*
> 5    *Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action ...
> need only be a reasonable, not the best or most reasonable, decision."
> 6    *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

7    *Id*. at 1070. A court must "defer to agency decisions so long as those conclusions are supported by

8    studies [] the agency deems reliable." *Native Ecosystems*, 697 F.3d at 1053 (internal citation and

9    quotation omitted).

10    Here, as described above, FWS has determined in the 2008 BiOp that delta smelt do not follow

11    the LSZ into the interior Delta during the transfer period. The 2008 BiOp has been subject to extensive

12    scrutiny and ultimately was upheld by the Ninth Circuit. The Court must defer to FWS's opinion in the

13    2008 BiOp. The Court expresses no opinion as to the relative strength of Tom Cannon's theory that

14    smelt do not pass through areas of high temperature to the salvage facilities (one place where they can

15    be counted) because they are killed along the way. The Court only finds that the expert agency disagrees

16    with Cannon's theory and that the Court must defer to the agency.

17    Yet, the 2008 BiOp is an ESA, not a NEPA, document. As Plaintiffs point out, NEPA and the

18    ESA have different standards: an EIS is required under NEPA "where there are substantial questions

19    about whether a project may cause significant degradation of the human environment," while the ESA

20    requires evaluation of whether a project will "jeopardize the continued existence of" a listed species or

21    "adversely modify" that species' critical habitat. *See* Doc. 65 at 3-4.

> 22    A finding of "no jeopardy" under the ESA indicates that an activity will
> not jeopardize the continued existence of an entire species, however, a
> 23    FONSI must be based on a review of the potential for significant
> impact[s], including impact[s] short of extinction. Clearly, there can be a
> 24    significant impact on a species even if its existence is not jeopardized.

25    *Nw. Envtl. Def. Ctr.*, 647 F. Supp. 2d at 1247. (internal citations and quotations omitted). Nevertheless,

26    an ESA document can be helpful in determining whether the degree of impact to a species will be

significant under NEPA. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006) (approving of EA that relied upon FWS "no jeopardy" BiOp regarding northern spotted owl to conclude that "[w]hile the Selected Alternative may affect habitat and has the potential to affect individual northern spotted owls, it will not be significant under [NEPA]."). Here, Reclamation is relying on the 2008 BiOp for the general proposition that during the transfer period, even if the LSZ is drawn into an area where temperatures are dangerously high, delta smelt do not follow the LSZ under such circumstances. Moreover, Reclamation relied on FWS's April 21, 2014 concurrence determination regarding the 2014 Transfer project, in which FWS concluded <u>no additional adverse effects to delta smelt or designated critical habitat, or increased incidental take as a result of the 2014 transfers were anticipated to occur</u>. *See* Allen Decl., Ex. 6 at 2. If the 2014 Transfer Project will not cause <u>any</u> "additional adverse effects," the Court cannot fathom how it could cause a "significant" impact, nor how there could be "substantial questions" regarding the presence of a significant impact. This conclusion is bolstered by the further conclusion in the EA that "[w]ater transfers are a small portion of total Project deliveries during the summer months." Allen Decl., Ex. 2 at 175. Moreover, the Cannon report relied on by Plaintiffs in their comments upon the Draft EA makes absolutely no specific mention of water transfers, thereby failing to address the relative contribution of water transfers to the conditions Cannon observed in 2013.

Plaintiffs argue that the EA should be rejected because it failed to provide the public with the information necessary to review and comment on the 2014 Transfer Project. An EA is meant to be a "concise public document ... that serves to," among other things "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). An EA must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 953 (9th Cir. 2008). An EA is "unacceptable" if it is "indecipherable to the public." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of*

1   *Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004). As noted above, standing alone, the EA does not

2   provide enough detail to the public regarding impacts to the smelt. However, the EA appropriately

3   incorporated by reference the 2008 BiOp, which contains sufficient support for the EA's conclusions

4   that the 2014 Transfer Project will not have significant impacts on the smelt.

5          Plaintiffs make much of the fact that some of the assumptions that underpinned the 2008 BiOp

6   have changed. Among other things, the SWRCB's TUC Orders relaxed D-1641 water quality standards

7   in light of the current drought. But, the Bureau sought the opinion of FWS on the impacts to smelt of

8   every D-1641 modification. In each case, FWS concurred that none of these changes will cause

9   "additional adverse effects on delta smelt" beyond that which was evaluated in the 2008 BiOp. Although

10  these further consultations are not explicitly mentioned in the EA, the EA does note that "[b]ecause of

11  the extremely dry conditions, Reclamation is consulting frequently with [FWS] on CVP and SWP

12  operations relative to the [2008 BiOp] and special status fish species in the Delta" and indicates that the

13  "current operational parameters applicable to conveyance of transfer water include .... the [SWRCB

14  TUC] Petition approved on January 31, 2014, <u>as may be amended</u>." Final EA at 2-4. Documents

15  pertaining to Reclamation's consultations with FWS about the TUC Order are publicly available on

16  Reclamation's website.[16] Therefore, the Final EA references publicly available documentation of FWS's

17  conclusions that additional changes to the operational parameters would not cause any additional harm

18  to the smelt.

19         An EA may be invalidated where it "fails to address certain crucial factors, consideration of

20  which is essential to a truly informed decision whether or not to prepare an EIS." *In Def. of Animals,*

21  *Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1072 (9th Cir.

22  2014). But this is not a circumstance in which the agency has failed to consider a crucial factor. In

23  *Foundation for the North American Wild Sheep v. U.S. Department of Agriculture* ("USDA"), 681 F.2d

24  1172, 1174-75, 1178-80 (9th Cir. 1982), the USDA issued an EA approving the reconstruction of two

25

26  ───────────────

[16] *See* http://www.usbr.gov/mp/BayDeltaOffice/Documents/Current_Implementation/index.html (last visited July 11, 2014).

mining access roads through an area occupied by one of the few remaining herds of desert bighorn sheep. Among other things, the EA failed to estimate the amount of traffic expected on the road or consider the fact that the road passed close to a "mineral lick" used by the bighorn. *Id.* at 1178-79. "The absence of this crucial information render[ed] a decision regarding the sheep's reaction to the traffic on [the road] ... is necessarily uninformed." *Id.* at 1181.

Here, Plaintiffs contend that the EA failed to examine a "crucial factor" in that it failed to consider that smelt were likely to be drawn into areas of the Delta where high temperatures could cause them adverse harm. As discussed above, the EA, by incorporating the 2008 BiOp, did in fact address this issue and disagreed with Plaintiffs' contention. The EA could have made its reliance on the 2008 BiOp for this point more explicit and clear, but NEPA does not require perfection. The Final EA was intelligible on the subject and did not fail to examine a "crucial factor." Moreover, while the EA could have been improved, its discussion was not so insufficient as to "frustrate NEPA's goal of ensuring that relevant information is available to the wider audience participating in agency decision-making." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 527 (9th Cir. 1994).

### 3. Plaintiffs' Demand for a Supplemental EA.

Plaintiffs also argue that Reclamation acted unlawfully by refusing to supplement the EA and FONSI in light of (1) the SWRCB's May 2, 2014 TUC Order relaxing Delta water quality standards; and (2) an analysis performed by Tom Cannon and presented to Reclamation in a June 10, 2014 letter that purports to demonstrate that the methodology used by the Bureau to measure Delta outflow (a key component to estimating where the LSZ will be and how much export pumping is permissible) grossly overestimates actual delta outflow.

### a. Applicable Legal Standard.

Agencies are required to supplement an existing EA only where there are "substantial changes to the proposed action" or "significant new circumstances or information" relevant to environmental concerns. 40 C.F.R. § 1502.9(c)(1)(i)-(ii); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 372

(1989).

> The supplement requirement is triggered by "new circumstances" when the underlying project significantly changes. *See, e.g., Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 561 (decision that substantially changed resource management plan requires supplemental EIS); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1152, 1157 (9th Cir. 2008) (per curiam) (changes to highway proposal in response to comments too minor to require supplement).
>
> Significant "new information" typically involves intervening information. *See, e.g., Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 935, 937–38 (9th Cir. 2010) (revelation of 1900 acres of nesting habitat in project area, discovered after Forest Service's Environmental Assessment stated that there were no known nesting grounds in area, triggered supplemental environmental assessment)....

*Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630, 633-34 (9th Cir. 2012).

"[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized" because to so hold "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh*, 490 U.S. at 373. Rather, the agency must apply a "rule of reason" that looks to "the value of the new information to the still pending decisionmaking process." *Id.* at 374. To trigger a supplemental EIS, the changes or new information must present "a seriously different picture of the likely environmental harms stemming from the proposed action." *Airport Communities Coal. v. Graves*, 280 F. Supp. 2d 1207, 1218 (W.D. Wash. 2003) (quoting *Wisconsin v. Weinberger*, 745 F.2d 412, 420 (7th Cir. 1984)). Moreover, an agency's decision not to prepare a supplemental EIS will not be overturned absent a "clear error of judgment." *Marsh*, 490 U.S. at 377–78 (internal citation and quotation omitted).

### b.   The SWRCB's May 2 TUC Order.

The May 2, 2014 TUC Order was just one in a line of TUC Orders issued this year, making incremental changes to the D-1641 standards. Reclamation consulted with FWS every time any such changes were proposed. On May 1, after some back and forth between the agencies, FWS issued a concurrence memorandum, indicating that the proposed changes to D-1641 would not cause any additional adverse effects on delta smelt or critical habitat. In light of the Court's conclusions on the merits of Plaintiffs' challenge to the EA, this Concurrence eliminates the possibility that the May 2, 2014 TUC Order presents "a seriously different picture of the likely environmental harms stemming

from the proposed action."

### c.      Tom Cannon's Analysis of the Method Used to Measure Delta Outflow.

Plaintiffs also offer an analysis prepared by Tom Cannon on or about June 9, 2014, which compares the Net Delta Outflow Index ("NDOI"), the methodology prescribed by the SWRCB to measure Delta outflow for regulatory purposes, against US Geological Survey measurements of actual Net Delta Outflow ("NDO"). Doc. 10, Ex. 6. After comparing NDOI against NDO for July 2013 and May 2014, Cannon concluded that NDOI "grossly overestimates" Delta outflow. *Id.* For example, while the NDOI estimated outflow at 3505 cfs in May 2014, USGS flow data indicates actual outflow was -45 cfs. *Id.*

Federal Defendants argue that this is not new information because SWRCB has been using NDOI to regulate Delta flows for 14 years and Plaintiffs had access to information (shown by the fact that Cannon's comparison used 2013 data) from which he could have made his comparisons well before the EA comment deadline passed. *See Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1464 (9th Cir. 1984) (holding plaintiffs' supplementation claim had "little merit" when the information they alleged was "new" was in fact available prior to the release of the NEPA document).

Cannon maintains that the discrepancy between NDOI and NDO is an "emerging concern" in the field. In his reply declaration, he indicates that the issue was discussed at a May 5, 2014 workshop of the Delta Stewardship Council, which produced the following report/summary:

> During his workshop presentation, MacWilliams raised the issue of inaccuracies in the NDOI estimates during low flows, expressing concerns similar to those alluded to by Jassby 20 years ago. He indicated the NDOI estimates during fall 2013 were more than double the USGS measured outflows and that, based on measured data for salinity intrusion and X2, the NDOI estimates appeared to be clearly incorrect. The average measured Delta outflow during fall 2013 was approximately 2,000 cfs, which failed to meet the Board's minimum outflow requirement of 3,000 to 3,500 cfs for fall months of a critically dry year. This issue may be a concern for the Board if NDOI estimates are found to consistently overestimate the measured outflows during the summer and fall months of future years. It is logical to ask why the measured outflows (rather than NDOI) aren't used for the specific outflow standards during the July-to-January period, and also why they aren't used as the alternative flow

31

compliance option in the springtime X2 standard. Also, does the availability of the measured outflows now remove any concern that Jassby et al. (1995) had regarding uncertainty in using outflow as the predictor variable during low flows? For the USGS estimates to be used as an outflow standard, several problems will need to be addressed, including gaps (missing data, especially during gage servicing), availability, short-term variability (because of the spring-neap tidal cycle and meteorological influences), and negative values (during periods when the Delta is filling). Although a precise estimate of the accuracy of the measured outflows is not known, the measured values should be more accurate than the NDOI as long as the four monitoring stations used in the calculations are operating properly.

Reply Declaration of Tom Cannon, Doc. 62, at ¶ 22. Cannon then declares that "[a]fter learning of this developing issue, I ran the numbers for May of 2014 (this data [ ] was not available before the Bureau's April 22, 2014 FONSI), and found strong confirmation that NDOI seriously overestimates actual Delta outflow as measured by NDO in the currently very dry conditions." *Id*. at ¶ 23. But, the report above indicates that these concerns are not at all new, citing 20-year old report. The fact that Cannon was not aware of the issue until after the May 5, 2014 workshop does not make it new information.

Moreover, as the quotation from the Delta Stewardship Council workshop indicates, there are reasons why NDOI is used over NDO. Among other things, the extreme changes in flow direction at the four NDO measuring points due to tidal shifts (300,000 – 400,000 cfs per day) magnifies gauge errors, while the NDOI metric is considered more reliable and reproducible. Moreover, the SWRCB mandates that Reclamation use NDOI when complying with D-1641. An agency is afforded considerable discretion in its choice of methodology in such circumstances. *See San Luis v. Jewell*, 747 F.3d at 618-19, 626-27 (reversing several instances in which the district court found the agency utilized an inappropriate measuring/calculating methodology, including one instance in which the methodological choice was thought to have potentially overestimated the movement of X2).

**B.    Conclusion Re: Likelihood of Success on the Merits.**

The Court concludes that Plaintiffs are not likely to succeed on either of the NEPA claims discussed above. Nor do Plaintiffs' arguments present "serious questions" going to the merits, as such questions are those that are "substantial, difficult, and doubtful, as to make them a fair ground for

litigation and thus for more deliberative investigation." *Marcos*, 862 F.2d at 1362. "Serious questions"

do not need to "promise a certainty of success, nor even present a probability of success, but must

involve a fair chance of success on the merits." *Id.* (citation and internal quotation marks omitted). Even

with respect to the challenge to the content of the EA, Plaintiffs do not present a "fair chance of success

on the merits" because their dispute boils down to a disagreement with an expert agency as to the

likelihood that the 2014 Transfer Project will draw smelt into areas of the Delta where they will be

subject to dangerously high temperatures. This Court must defer to the agency on such matters. It is

therefore unnecessary to discuss the presented evidence pertaining to the balance of the harms.

## V. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above, Plaintiffs' motion for preliminary injunction is DENIED.

IT IS SO ORDERED.

Dated:   **July 11, 2014**                    **/s/ Lawrence J. O'Neill**
UNITED STATES DISTRICT JUDGE